

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described**.

Signed October 9, 2008

*Barbara J. Houser*

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE | § | |
| | § | |
| HOME INTERIORS & GIFTS, INC. | § | Case No. 08-31961-11-BJH |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| MEREDITH CORPORATION | § | |
| | § | |
| Plaintiff, | § | Adversary No. 08-03125-BJH |
| v. | § | |
| | § | |
| HOME INTERIORS & GIFTS, INC. | § | |
| | § | |
| Defendants. | § | |

### MEMORANDUM OPINION AND ORDER

Before the Court is the Application of Meredith Corporation for Allowance and Payment of Administrative Expense Claim (the "Application") and the Debtor's Objection to Meredith Corporation's Claims Related to Rejection of License Agreement (the "Claim Objection"). The

**Memorandum Opinion and Order**

Court has core jurisdiction over the Application and the Claim Objection in accordance with 28 U.S.C. §§ 1334 and 157(b).  This Memorandum Opinion and Order contains the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## I.      FACTUAL BACKGROUND

### A.      Procedural Context.

On April 29, 2008 (the "Petition Date"), Home Interiors & Gifts, Inc. (the "Debtor" or "HIG") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby commencing the above Chapter 11 case (the "Case").  Prior to the Petition Date (on or about June 8, 2003), HIG and Meredith Corporation ("Meredith") entered into an agreement entitled "Meredith Corporation - Home Interiors & Gifts, Inc. Strategic Alliance" (the "License Agreement").  *See*  Meredith Ex 1. The License Agreement allows HIG to use certain trademarks owned by Meredith in connection with HIG's products; specifically, the *Better Homes and Gardens* trademarks (the "BHG Marks").

After Meredith filed its Motion for Order Compelling Assumption or Rejection of License Agreement (the "Motion to Compel"), HIG agreed to make its decision regarding assumption or rejection of the License Agreement by June 13, 2008.  On that date, the Debtor filed its Motion to Reject the License Agreement.  Thereafter, an Order was entered authorizing the Debtor's rejection of the License Agreement.

On July 7, 2008, Meredith filed two claims in the Case – *i.e.*, (1) an unsecured contract rejection claim, and (2) an administrative expense claim for the Debtor's alleged post-petition use of the BHG Marks.  At the outset of the hearing on the Application and the Claim Objection, the Debtor and Meredith announced that they had agreed upon the amount that should be allowed for Meredith's unsecured rejection claim, leaving this Court to decide the amount, if any, of Meredith's

allowed administrative expense claim in the Case. Meredith calculates its administrative expense claim at $1,125,000.24. The Debtor denies that Meredith has an allowable administrative expense claim.

**B.     HIG's Alleged Use of the BHG Marks Post-Petition**.

A brief explanation of the Debtor's business and how it is conducted will be helpful to an understanding of the basis for Meredith's assertion of an administrative expense claim in the Case. HIG is a home decor company, selling home decorative accessories such as artificial flowers, candles, framed artwork, mirrors, sconces, and shelves through approximately 100,000 independent representatives (the "Decorating Consultants"). HIG sells its products to the Decorating Consultants at a discount, allowing the Decorating Consultants to resell the products to the end-consumer at retail price through, primarily, in-home sales parties. HIG utilizes various print marketing tools to market its products through the Decorating Consultants.

While not an exhaustive list, there are several routine print marketing materials published and circulated by HIG. First, on a quarterly basis, HIG prepares, prints, and circulates what is commonly referred to as the "Quarterly Catalog" or the "Quarterly" (the "Quarterly"). The Quarterly contains all the active, core products that HIG sells and is sent to the Decorating Consultants on a quarterly basis. In addition to the Quarterly, on a monthly basis HIG publishes a publication for the Decorating Consultants called "News From Home" (the "News"). The News contains HIG products, information for consultants, new product offerings, consultant recognition, and suggestions on how to sell HIG products. HIG also publishes a monthly catalog (the "Monthly"). The Monthly is a smaller version of the Quarterly that is published on a monthly basis and sent to the Decorating Consultants.

As noted previously, the License Agreement, which runs for a thirteen year term, allows HIG to use the BHG Marks. While the Debtor was in default under the License Agreement prepetition, Meredith chose not to terminate that agreement. The License Agreement requires HIG to make payments for its use of the BHG Marks in specified amounts for each "contract year." The minimum royalty due each "contract year" is specifically defined in the License Agreement as the "Guaranteed Annual Minimum Royalty" (the "GAMR"). The GAMR due for any contract year is paid on a specific percentage schedule set out in the License Agreement – *i.e.*, (i) 20% of the GAMR is due by April 30, (ii) 45% is due by July 31, (iii) 65% is due by October 31, and (iv) 100% is due by January 31 of the following year.[1]

Pursuant to the terms of the License Agreement, the GAMR for 2008 is $4,500,000 (the "2008 GAMR"). The first percentage payment toward the 2008 GAMR, in the amount of $900,000, was due on April 30, 2008 – the day after the Petition Date. The Debtor failed to make this payment.

Under the License Agreement, HIG was allowed to utilize the BHG Marks on over 900 of its products. However, Meredith maintains extensive control and involvement regarding the quality and type of goods that may contain the BHG Marks. With respect to products that utilize the BHG Marks, Meredith has to approve any such product – both in concept and as a finished product. In addition to the approval of all products containing the BHG Marks, Meredith is also extensively involved in reviewing and approving all advertising materials prepared and circulated by HIG to sell products bearing the BHG Marks, including the Quarterly, the Monthly, and the News.

Beginning in March 2008, the Quarterly for Summer 2008 was printed (the "Summer

---

[1]Under the License Agreement, HIG could be required to pay more than the GAMR in a contract year if its sales exceed a certain level. HIG's sales never met this threshold. Accordingly, the only amounts ever owing under the License Agreement were the GAMR.

Quarterly"). Prior to its printing, Meredith approved the Summer Quarterly, including the products containing the BHG Marks and the layouts of the pages containing the BHG Marks. Meredith also approved, prepetition, (i) the News where their product was featured, including the News for April 2008, which was mailed to the Decorating Consultants on March 19, 2008, and the News for May 2008, and (ii) the Monthly for April and May 2008.

The Summer Quarterly, the May News, and the May Monthly are the last publications that contained any advertising for products bearing the BHG Marks. After these publications were printed, HIG removed all products bearing the BHG Marks from its marketing materials.

With respect to HIG's sale of goods bearing the BHG Marks following the Petition Date, Meredith has taken no affirmative act under the License Agreement. In other words, while the License Agreement provides for Meredith's approval of (i) products to be marked, and (ii) HIG's marketing materials, Meredith approved all of the products and materials prepetition. And, while Meredith could have sought relief from the automatic stay post-petition in order to terminate the License Agreement (due to the Debtor's prepetition breach of that agreement), Meredith did not seek to do so. Rather, according to Meredith, it hoped that the Debtor would elect to assume the License Agreement, although perhaps on renegotiated, agreed terms.

## II. CONTENTIONS OF THE PARTIES

As noted previously, Meredith asserts an administrative expense claim in the Case in the amount of $1,125,000.24. From Meredith's perspective, (i) about one million catalogs containing products bearing the BHG Marks were received by the Decorating Consultants just as the Case was being filed, and (ii) the Decorating Consultants have used these catalogs to sell the Debtor's products, including products bearing the BHG Marks, to end-users post-petition, thereby creating

revenue for the Debtor.  According to Meredith,

> [t]he very purpose of the use of the BHG Marks in these catalogues is to promote the Debtor's products so marked as quality products through the affiliation, strength, and recognition of the *Better Homes and Gardens* brand name.  The inherent value of the *Better Homes and Gardens* brand used by the Debtor enhances the value of the Debtor's products to which it is affixed.  As a result, the Debtor is receiving the benefit of the post-petition use of the BHG Marks in the advertising and promotion of the sale of the Debtor's products post-petition.  In addition to advertising and promotion before the sale, the Debtor also utilizes the BHG Marks on certain inventory sold and even includes the BHG Marks on certain boxes and containers used to ship orders to customers.  Shipping products to the general public bearing the BHG Marks also constitutes post-petition use of the BHG Marks, which entitles Meredith to an administrative expense claim.

Meredith Corporation's Sur-Reply to Debtor's Reply in Support of Objections to Meredith Corporation's Claims (the "Sur-Reply"), p. 7.  In other words, according to Meredith, because the Debtor has used the BHG Marks to generate post-petition revenue, Meredith is entitled to an administrative expense claim in the Case for that use.

Meredith calculates its administrative expense claim for the Debtor's use of the BHG Marks for two distinct post-petition time periods – *i.e.*, (1) from the Petition Date until the Rejection Date (the "First Period"), and (2) from the day following the Rejection Date until September 29, 2008, when the Winter Quarterly will be mailed to the Decorating Consultants (the "Second Period").[2]  For the First Period, Meredith calculates its administrative expense claim as follows:

> The value of the claim is determined by the License Agreement, applied on a prorata basis.  The quarterly minimum royalty payment due under the License Agreement for April-June 2008 is $1,125,000 or $12,362.64 per day. . . . Accordingly, the total administrative claim for the use of the BHG Marks for the 45 days from the Petition Date (April 29, 2008) until the filing of the rejection motion (June 13, 2008) is $556,318.80 (45 x $12,362.64).

---

[2]Meredith contends that once the Winter Quarterly catalog is released, it is less likely that product sales will be predicated upon the Summer Quarterly (and the related monthly catalogs) containing products bearing the BHG Marks.

Application, ¶ 3. For the Second Period, Meredith calculates its administrative claim based upon "one-half (½) the minimum royalty amount of $12,362.64 per day from June 14, 2008 (the day after the rejection motion) to September 29, 2008 ($6,181.32 per day x 92 days = $568,681.44). Meredith therefore has an administrative expense claim for an additional amount of $568,681.44." *Id*. at ¶ 4.

In contrast, the Debtor contends that Meredith is not entitled to any administrative expense claim in the Case. According to the Debtor, all products sold by the Debtor post-petition bearing the BHG Marks were purchased by and manufactured for it prepetition pursuant to the prepetition License Agreement. Moreover, according to the Debtor, Meredith provided no new consideration to the debtor-in-possession post-petition. Therefore, Meredith is not entitled to an administrative expense claim in the Case. From the Debtor's perspective, Meredith is seeking to convert a prepetition unsecured claim into a post-petition administrative expense claim, which the law does not allow. The Debtor also contests Meredith's calculation of its alleged administrative expense claim.

## III. LEGAL ANALYSIS

### A. Administrative Expense Claims in General.

Section 503(a) of the Bankruptcy Code authorizes entities to file requests for payment of administrative expenses. Section 503(b)(1) of the Bankruptcy Code provides, in pertinent part, that "[a]fter notice and a hearing, there shall be allowed administrative expenses, . . . including . . . the actual, necessary costs and expenses of preserving the estate. . . ." 11 U.S.C. § 503(b)(1)(A). Administrative expenses are given priority pursuant to section 507(a) of the Bankruptcy Code.

In analyzing the statutory requirements imposed by section 503 of the Bankruptcy Code, the Fifth Circuit has held that "[i]n order to qualify as an 'actual and necessary cost' under section

503(b)(1)(A), a claim against the estate must have arisen post-petition and as a result of actions taken by the trustee that benefitted the estate." *In re Jack/Wade Drilling, Inc.*, 258 F.3d 385, 387 (5th Cir. 2001) (citing *Toma Steel Supply, Inc. v. TransAmerican Natural Gas Corp. (In re TransAmerican Natural Gas Corp.)*, 978 F.2d 1409, 1416 (5th Cir. 1992), which found that a "prima facie case under § 503(b)(1) may be established by evidence that (1) the claim arises from a transaction with the debtor-in-possession; and (2) the goods or services supplied enhanced the ability of the debtor-in-possession's business to function"). In determining whether there was a "transaction with the bankruptcy estate," the Sixth Circuit concluded that "the proper focus [is] on the inducement involved in causing the creditor to part with its goods or services." *United Trucking Serv., Inc. v. Trailer Rental Co. (In re United Trucking Serv., Inc.)*, 851 F.2d 159, 162 (6th Cir. 1988). As explained by the Sixth Circuit in *Employee Transfer Corp. v. Grigsby (In re White Motor Corp.)*, 831 F.2d 106 (6th Cir. 1987):

> A creditor provides consideration to the bankruptcy estate only when the debtor-in-possession induces the creditor's performance and performance is then rendered to the estate. If the inducement came from a pre-petition debtor, then consideration was given to that entity rather than to the debtor-in-possession. However, if the inducement came from the debtor-in-possession, then the claims of the creditor are given priority.

*Id*. at 110.

Section 503 priorities are to be construed narrowly "because of the presumption that the debtor has limited resources to equally distribute among creditors." *In re Kmart Corp.*, 290 B.R. 614, 621 (Bankr. N.D. Ill. 2003) (citing *In re Amarex*, 853 F.2d 1526, 1530 (10th Cir. 1988) and *In re Mammoth Mart, Inc.*, 536 F.2d 950, 953 (1st Cir. 1976) ("To give priority to a claimant not clearly entitled thereto is inconsistent with the policy of equality of distribution; it dilutes the value of the

priority for those creditors Congress intended to prefer."). The burden of establishing whether an expense is entitled to an administrative priority is on the claimant. *Kmart*, 290 B.R. at 621.

> **B.      HIG's Post-Petition Use of the BHG Marks.**

As noted previously, HIG asserts that Meredith's administrative expense claim "relates only to the sales of products Meredith approved pre-petition, contained in marketing materials published pre-petition." Claim Objection, at 9. As such, HIG claims that Meredith can not meet its burden of demonstrating that HIG induced Meredith to engage in a post-petition "transaction." *See* Claim Objection, at 13 (quoting *In re Amarex*, 853 F.2d 1526, 1530 (10th Cir. 1988)). However, HIG's focus on post-petition "inducement" is misplaced in a trademark use context. For the reasons explained more fully below, the Court finds that HIG continued to market, sell, and distribute products bearing the BHG Marks after the Petition Date. This continued post-petition "use" of the BHG Marks arose as a result of actions taken by HIG that benefitted the HIG bankruptcy estate. Accordingly, this Court concludes that Meredith is entitled to an allowed administrative expense claim to compensate it for such post-petition "use" of the BHG Marks. *Jack/Wade Drilling, Inc.*, 258 F.3d at 387.

While it is true that (i) Meredith approved the use of the BHG Marks on all of the relevant products and materials prior to its bankruptcy filing, and (ii) all of the publications in question – *i.e.*, the Summer Quarterly, the May News, and the May Monthly – were printed by HIG prior to the Petition Date, those facts do not preclude the grant of an administrative expense claim to Meredith. The actual date of product approval or physical production of marketing materials is not the relevant inquiry in the context of the post-petition use of a trademark. As the Fifth Circuit has stated, "[a] federal registration does not create the trademark, the trademark is acquired by *use* (emphasis

added).” *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 669 (5th Cir. 2000)(citing to *Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F. 2d 812, 819 (1st Cir. 1987)). In addition to finding that “registration does not create the underlying right in a trademark,” the First Circuit also held that the “underlying right [to the trademark] . . . accrues from the *use* of a particular name or symbol [and] is essentially a common law property right . . . (emphasis added).” *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 372 (1st Cir. 1980). Failure to properly “use,” monitor or promote a trademark can constitute abandonment, thereby rendering the mark invalid. *See Lanham Act*, 15 U.S.C. § 1115(b)(2). Thus, the true value of a trademark comes from its public use, and in a trademark context, this Court concludes that “use” can be succinctly defined as a continuous introduction of the mark into the stream of commerce.

Here, HIG concedes that it continued to use, post-petition, “an extensive network of Decorating Consultants who sell HIG’s products to friends, family, and other customers.” Claim Objection, at 19. This “extensive network” of Decorating Consultants has continued to actively promote and market products bearing the BHG Marks to the public at-large since the Petition Date. Moreover, HIG has continued to market, sell, and distribute products bearing the BHG Marks within the stream of commerce to at least its Decorating Consultants since the Petition Date. These post-petition acts by the debtor-in-possession are sufficient to trigger an administrative expense claim in Meredith’s favor.

This conclusion is supported by the only reported decision directly on point – *i.e.*, *In re Beverage Canners Int’l. Corp.*, 255 B.R. 89 (Bankr. S.D. Fla. 2000). In *Beverage Canners*, the debtors manufactured, sold and distributed branded and private label soft drinks and water. Prepetition, the debtors entered into a licensing agreement with the Nature Conservancy (“Nature”),

under which Nature granted the debtors a license to display certain trademarks on the labels affixed to certain bottled water products the debtors sold.  In order to include the trademarks on these labels, the debtors had specific printing plates created, which the court found would cost about $60,000 to replace.  After the debtors' bankruptcy filings, the debtors "continued to utilize the Trademarks in the same manner as they did prepetition" until the debtors' water business was sold to a third party and the court deemed the licensing agreement rejected.  *Id*. at 91. Based upon this post-petition use, Nature alleged an administrative claim in the full amount of the minimum royalty that the debtors had agreed to pay pursuant to the licensing agreement (apparently calculated on a pro rata basis for the days of usage).  The *Beverage Canners* court held that the debtor's post-petition sale of marked product entitled Nature to an allowed administrative claim.  Specifically, the court noted that "the Debtors here continued to use the Trademarks in the contracted-for capacity from the commencement of the case through the Rejection Date and therefore received the exact type of benefit bargained for.  No potential under the contract was left unused." *Id*. at 93.

While HIG attempts to distinguish *Beverage Canners* factually, asserting that the debtors there manufactured labels and affixed them to product post-petition, in addition to simply selling prepetition product on which prepetition manufactured labels had been affixed, it is unclear from the reported decision if that is true.  HIG draws this distinction from the *Beverage Canners* court's finding that "the Debtors continued to utilize the Trademarks in the same manner as they did prepetition." *Id*.  While that is a possible inference from this finding, the *Beverage Canners* court does not expressly state that the debtors manufactured product post-petition in addition to having sold marked product post-petition.  Even assuming that HIG is correct, however, from this Court's perspective, that factual distinction is not sufficient to change the outcome here.  The *Beverage*

*Canners* court's analysis remains persuasive.

Although neither party nor the Court found other cases directly on point regarding administrative expense claims arising from the post-petition use of a trademark, there are other cases in an analogous context that are instructive here – *i.e.*, case law involving administrative expense claims arising from the debtor's post-petition use of real property under a lease agreement prior to the 1984 amendment of section 365(d) of the Bankruptcy Code. In these pre-1984 amendment cases, courts routinely granted allowed administrative expense claims to lessors for the debtor's continued use of the real property post-petition.[3] *See, e.g., In re Lacklow Brothers*, *Inc.*, 18 B.R. 770, 771-72 (Bankr. S.D. Fla. 1982); *In re Standard Furniture Co.*, 3 B.R. 527, 530 (Bankr. S.D. Cal. 1980). Moreover, in these pre-1984 amendment cases, post-petition inducement by the debtor/lessee was not required in order to award the lessor an administrative expense claim. The debtor's continued post-petition use of the property, under the terms agreed upon prepetition, was sufficient to trigger administrative expense liability.

In drawing tacit comparisons to this pre-1984 treatment of lessors,[4] the *Beverage Canners* court found that a trademark owner was similarly eligible for an administrative expense claim based upon the debtors' post-petition, pre-rejection use of its trademark under terms prescribed in a prepetition license agreement. *Beverage Canners*, 255 B.R. at 93-94. In coming to its conclusion, the court noted that "if the debtors escape the burden of an administrative expense, they would in effect gain whatever benefit remained inherent in the use of the Trademarks . . . and would not have

---

[3]Of course, that outcome is now mandated by section 365(d) of the Bankruptcy Code, which was added in 1984.

[4] Comparisons which are appropriate based upon the First Circuit's *Keebler* decision, in which a trademark right was held to be "essentially a common law property right." *Keebler Co.*, 624 F.2d at 372.

to pay for the use." *Id*.

Although the underlying policy rationale is never fully articulated by the courts, the pre-1984 treatment of lessors, as well as the treatment of the trademark owner in *Beverage Canners*, demonstrates that courts are inclined to allow administrative expense claims to such parties when the issue involves the debtor's continued post-petition use of someone else's property.[5]  In these instances, the general administrative expense claim requirement as stated in *In re Amarex,* 853 F.2d at 1530, of a post-petition transaction and inducement by the debtor is not the relevant inquiry. Rather, in the trademark and pre-1984 real property cases, courts addressing this issue have looked primarily to the debtor's continued post-petition "use" of that property, and whether such use benefitted the bankruptcy estate.  *See Beverage Canners*, 255 B.R. at 96; *Standard Furniture*, 3 B.R. at 530.

Here, when HIG continued to place products bearing the BHG Marks into the stream of commerce post-petition based on the License Agreement, and that post-petition use of the BHG Marks benefitted the HIG bankruptcy estate, Meredith became entitled to an allowed administrative expense claim.  In other words, HIG's post-petition sale and distribution of products bearing the BHG Marks qualifies as an "actual" and "necessary" expense of preserving HIG's bankruptcy estate under section 503(b)(1)(A).  From this Court's perspective, HIG chose to take advantage of its rights

---

[5] Since cited by HIG, this Court has analyzed the holdings of *In re Jartran, Inc.*, 732 F.2d 584 (7th Cir. 1984) and other "phonebook cases" in deciding the proper outcome here.  In *Jartran*, the Seventh Circuit denied a yellow pages publisher an administrative expense claim for the debtor's prepetition placement of an add in the yellow pages.  While the yellow pages were printed and distributed prepetition, the publisher contended that the debtor "benefitted" post-petition from the ad, giving rise to an administrative expense claim.  The Seventh Circuit disagreed.
   From this Court's perspective, *Jartran* and its progeny are distinguishable because the debtor committed no post-petition act.  In other words, the creditor controlled the use of the property.  The debtor could not cause the ad to be removed and wasn't the party in control of the distribution or use of the yellow page's ad.  Here, in contrast, HIG chose to sell and distribute products bearing the BHG Marks post-petition.  Accordingly, HIG must pay for that post-petition use of the BHG Marks.

**Memorandum Opinion and Order**                                                                 **Page 13**

under the License Agreement by selling and distributing products bearing the BHG Marks post-petition, and the HIG bankruptcy estate benefitted from such post-petition use.[6]  Under these facts, "[i]f the Debtor escape[s] the burden of an administrative expense, [it] would in effect gain whatever benefit remained inherent in the use of the Trademarks . . . and would not have to pay for the use." *Beverage Canners*, 255 B.R. at 95.  This Court agrees with the *Beverage Canners* court when it held that it "can not allow Section 503 of the Code to be manipulated in order to achieve such a result." *Id.*

Generally "rejection of an executory contract . . . of the debtor constitutes a breach" of that contract "immediately before the date of the filing of the [bankruptcy] petition," 11 U.S.C. § 365(g)(1), and claims "arising from the rejection . . . of an executory contract . . . shall be allowed . . . or disallowed . . . as if such claim had arisen before the date of the filing of the petition,"– *i.e.*, as a prepetition unsecured claim, 11 U.S.C. § 502(g)(1).  However, where the debtor continues to use the property covered by the executory contract following its rejection of that contract, the non-debtor party may be entitled to an administrative expense claim for such continued use post-rejection. *See, e.g., In re Malden Mills Indus.*, 303 B.R. 688, 703-04 (1st Cir. BAP 2004); *In re DVI, Inc.*, 308 B.R. 703, 708 (Bankr. D. Del. 2004).  Further administrative expense liability is imposed if the post-rejection use of the property benefits the debtor's bankruptcy estate. *See* 11 U.S.C. §503(b)(1)(A);

---

[6] In coming to its conclusion that the HIG bankruptcy estate benefitted from HIG's post-petition use of the BHG Marks, the Court rejects HIG's argument that it did not actually receive $1,100,000 in benefits from its post-petition use of the BHG Marks and therefore, Meredith's administrative expense claim should be limited or disallowed.  Regardless of the actual dollars and cents that HIG received from the post-petition promotion, sale, and distribution of products bearing the BHG Marks, HIG had the right to use the BHG Marks pursuant to the terms of the License Agreement in an unfettered manner post-petition.  In other words, Meredith did nothing to restrict the Debtor's use of the BHG Marks after HIG's bankruptcy filing.  Moreover, the terms of the License Agreement itself show the fallacy of this argument.  In the License Agreement, HIG agreed to pay Meredith a guaranteed annual minimum royalty simply for the right to use the BHG Marks irrespective of any particular level of product sales and even after the License Agreement terminated. *See infra* pp. 21-22.

*see also In re Malden Mills Indus.*, 303 B.R. at 704; *Nat'l Record Mart Inc.*, 272 B.R. 131, 135 (Bankr. W.D. Pa. 2001). In the real property context, a debtor's continued use of the lessor's property after rejection entitles the lessor to a post-rejection administrative expense claim based upon the amount of benefit to the bankruptcy estate. *See In re Cardinal Indus.*, 109 B.R. 738, 741 (Bankr. S.D. Ohio 1989); *In re Homeowner's Outlet Mall Exch.*, 89 B.R. 965, 970 (Bankr. S.D. Fla. 1988). That outcome makes sense and is not inconsistent with section 502(g)(1) of the Bankruptcy Code because the post-rejection use claim does not arise from rejection; rather, it arises from the debtor's decision to continue to use the property notwithstanding its rejection of the lease.

Here, HIG rejected the License Agreement on June 13, 2008. However, notwithstanding its rejection of the License Agreement, HIG continued to "use" the BHG Marks by allowing the Decorating Consultants to continue to sell marked products from the Summer Quarterly and related catalogs and by itself continuing to sell and distribute marked products to the Decorating Consultants for resale to their various customers. In other words, notwithstanding its rejection of the License Agreement, HIG took acts inconsistent with rejection which benefitted the HIG bankruptcy estate by generating post-petition, post-rejection revenues. Accordingly, Meredith is entitled to a further administrative expense claim for such continued use.

If HIG wanted to limit its administrative expense claim exposure to Meredith following its rejection of the License Agreement, it should have (i) advised the Decorating Consultants that products bearing the BHG Marks were no longer available for sale as of June 14, 2008, and (ii) stopped selling and distributing products bearing the BHG Marks on that date. If HIG's use of the BHG Marks ceased contemporaneously with its rejection of the License Agreement, any further claim "arising from the rejection" would simply be a prepetition unsecured claim in the Case. 11

U.S.C. § 502(g)(1).  However, since HIG continued to benefit from the use of the BHG Marks post-rejection,  Meredith "may be entitled to a priority administrative claim for services provided during the post-petition, post-rejection period" for the value of the use of its property between the date of rejection and the date of the "surrender" of the property by HIG.  *See In re Malden Mills Indus., Inc.*, 303 B.R. at 706 (quoting Lawrence P. King, Collier on Bankruptcy ¶ 502.08[a][2]).

Because HIG's bankruptcy estate continued to obtain benefits from the BHG Marks in the post-rejection period, Meredith is entitled to a further administrative expense claim for the value of such use during the Second Period.

### C.    Calculating Meredith's Administrative Expense Claim.

### 1.    The First Period.

As for the proper measure of Meredith's administrative expense claim, the pre-1984 lessor case law is equally insightful.  Although these cases dealt with real property usage, and the issue here pertains to trademark usage, there are significant similarities between the two due to the on-going relationship between the property owner and the debtor's post-petition use of that property.[7]  In the pre-1984 real property lease cases, courts often looked to the prepetition agreement to determine the proper amount of the allowable administrative expense.  For example, in *Standard Furniture,* 3 B.R. at 530, the court found that "where a [pre-petition] lease is ultimately rejected [post-petition], or for the period pending either rejection or assumption, the amount of allowable expense for

---

[7] Although much of the case law pertaining to this issue from the years 1978 - 1984 bases its legal analysis on Sections 63 and 64 of the Bankruptcy Act of 1898, courts generally found "no meaningful difference between §64(a)(1) of the former Bankruptcy Act and 11 U.S.C. §503(b)(1)(A) of the Bankruptcy Reform Act of 1978. Each section allows a priority to the actual and necessary costs and expenses of preserving the estate subsequent to the commencement of the case. Therefore, the body of law that grew up interpreting § 64(a)(1) has value as precedent in interpreting 11 U.S.C. §503(b)(1)(A)."  *See, e.g., In re Peninsula Gunite, Inc.*, 24 B.R. 593, 594 (BAP 9th Cir.1982).

administrative rent is measured by the period of actual occupation and use of the premises [and] this amount is ordinarily, but not necessarily, determined by an allocation of rent reserved in the lease on a pro rata basis." Finding the rental rate stated in the lease "reasonable," the court allowed an administrative claim to the lessor based upon a pro rata allocation of the contractual rent for the days of post-petition usage. *Id*. at 531. *See also In re Frederick Meats, Inc*., 483 F.2d 951, 952 (9th Cir. 1972) (allowing the lessor administrative rent for a four-day period in an amount equal to the pro rata portion of the rent reserved in the lease, and finding, without discussion, the contractual rent to be *per se* reasonable).

A similar result was reached in *Lacklow Brothers*, 18 B.R. at 772, when the court held that "the quantum of allowance as an expense of administration for use and enjoyment by the trustee [during the post-petition/pre-rejection period] will be measured by the reasonable value of such use and enjoyment." The court further held that "ordinarily, [reasonable value] will be the contractual rent predicated and prorated from the time the trustee is in occupancy." *Id*. However, the court noted that before awarding the lessor an administrative claim based upon the contractual rent, it should determine that such rent "[was] not clearly unreasonable." *Id*.

These "contract price" cases stand for a general proposition that the contract rate, as negotiated freely between the parties prepetition, is the best indicator of what constitutes a reasonable price for the debtor's use of the property in question during the post-petition, pre-rejection period. In other words, these courts have essentially accorded the contract price presumptive validity in the absence of evidence that the prepetition contract price is clearly unreasonable.

This approach was used by the *Beverage Canners* court in the trademark context. There, the court stated:

> [p]resumptively, the value of consideration received under an executory contract is the amount set forth in such contract.  The basis for such a presumption is that the parties are in the best position to negotiate the terms and value of the consideration.  It logically follows that if a debtor makes full use of the services provided under a contract, the benefit to the debtor is the entire bargained for value pursuant to such agreement.

*Beverage Canners*, 255 B.R. at 93.  Because the debtors failed to put on evidence to rebut the presumption that the minimum royalty provided for in the contract was the value received by the debtors "under the contract by continuing to display the Trademarks after the commencement of the case," the *Beverage Canners* court concluded that "Nature [was] entitled to be paid for this use regardless of the impact on the Debtors' sales of bottled water."  *Id*. at 93-94.

This Court agrees that the contract price, as freely negotiated between the parties, should presumptively set the measure of recovery to an administrative expense claimant arising from a debtor's post-petition, pre-rejection use of a trademark.  The best measure of a particular mark's value is most accurately determined by looking to what the parties negotiated prepetition.  Free market forces work to help ensure that each party bargained for the best deal possible.  However, to the extent that the contract price is clearly unreasonable for some reason, the debtor may rebut the presumption by introducing evidence to the contrary.

Accordingly, the starting point in calculating Meredith's allowed administrative expense claim is the royalty amount provided for in the License Agreement, prorated for the days of actual usage of the BHG Marks during the post-petition, pre-rejection period.  This amount is presumptively the value of the consideration received by HIG from its post-petition use of the BHG Marks.  HIG did not introduce sufficient evidence to rebut this presumption.

According to Meredith, the quarterly minimum royalty payment due under the License Agreement for "April-June 2008" is $1,125,000 or $12,362.64 per day.  Meredith then multiplies the

**Memorandum Opinion and Order**                                                                                           **Page 18**

daily royalty times the number of days in the First Period – *i.e.*, from the Petition Date (April 29, 2008) until the filing of the rejection motion by HIG (June 13, 2008).  According to Meredith, there are 45 days in the First Period, giving rise to an allowable administrative expense claim of $556,318.80 (45 x $12,362.64).  Application, ¶ 3.

After reviewing the License Agreement, this Court disagrees with Meredith's calculation. While the License Agreement provides for the payment of the GAMR in quarterly intervals throughout each year, contrary to Meredith's assertion, the License Agreement breaks these four quarters into the following periods:[8] February 1 - April 30, May 1 - July 31, August 1 - October 31, and November 1 - January 31.  *See* Meredith Ex. 1 (License Agreement, at G.(2)).  Meredith's alleged "April - June" interval simply does not exist and, as such, calculations for the post-petition, pre-rejection period must be based upon per diem calculations for not one, but two quarterly intervals: February 1 - April 30, and May 1 - July 31.  As noted previously, for 2008, the GAMR amount due to Meredith for the January - April quarter is $900,000, or $10,000 per day.  Since two days of the post-petition, pre-rejection period fell within this interval, April 29 - 30, the amount due for these days totals $20,000.  The remainder of the post-petition, pre-rejection period, from May 1 - June 13, falls within the May 1 - July 31 quarterly interval, and the per diem amount due to Meredith for this interval is $12,228.26 ($1,125,000 ÷ 92 days in the quarterly interval).  Since 44 of the 46 days constituting the First Period fall within this interval, the amount due for the May 1 - July 31 quarterly interval totals $538,043.44.  Adding this amount to the $20,000 earned for April 29 - 30, gives Meredith an administrative expense claim of $558,043.44 for the First Period.

---

[8]The Court understands that these intervals correspond to the anticipated timing of HIG's product sales.  In other words, more of the GAMR is due during the quarters of anticipated higher product sales.

**Memorandum Opinion and Order**                                                                                  **Page 19**

However, since the Application only sought allowance of an administrative expense claim of $556,318.80 for the First Period, the Court will allow the claim in the amount sought by Meredith.

### 2.      The Second Period.

Meredith asserts that HIG's use of the BHG Marks continued for a period of time following HIG's rejection of the License Agreement. Specifically, Meredith contends that HIG will continue to use the BHG Marks until HIG and the Decorating Consultants quit selling and distributing marked products and a catalog containing no marked products replaces the Summer Quarterly in the marketplace. Accordingly, Meredith asserts a right to a further administrative expense claim for the Second Period – *i.e.*, from June 14, 2008 (the day after rejection) until September 29, 2008 (the date of delivery of the Winter Quarterly catalog to the Decorating Consultants). For the Second Period, Meredith calculates its administrative claim based upon "one-half (½) the minimum royalty amount of $12,362.64 per day from June 14, 2008 (the day after the rejection motion) to September 29, 2008 ($6,181.32 per day x 92 days = $568,681.44)," entitling it to "an administrative expense claim for an additional amount of $568,681.44." Application, at ¶ 4.

The Court agrees with Meredith that HIG has continued to use the BHG Marks following HIG's rejection of the License Agreement. The Court also agrees that Meredith is entitled to be compensated for this continuing post-rejection use of the BHG Marks to the extent such continuing use benefitted the HIG bankruptcy estate. Thus, the Court must now determine the amount of Meredith's administrative expense claim for HIG's post-rejection use of the BHG Marks.

Once rejection of the License Agreement occurred, "the contractual terms of the lease no longer obligate" HIG. *In re Roberds, Inc.* 270 B.R. 702, 705 (Bankr. S.D. Ohio 2001). Rather, fair market value sets the applicable rate of administrative expense recovery in the post-rejection period.

*See In re DVI, Inc.*, 308 B.R. at 708; *In re Cardinal Indus.*, 109 B.R. at 741.

Although the contract rate is no longer applicable *per se* in the post-rejection period, courts invariably look to the rates negotiated by the parties in the contract to determine the fair market value of the debtor's continued use of the contracted-for property. *See, e.g.*, *In re DVI, Inc.*, 308 B.R. at 708. Furthermore, absent evidence by the debtor to the contrary, "the contract rate is presumed to be the fair rental value." *Id.*; *See also In re Rare Coin Galleries of America, Inc.*, 72 B.R. 415, 417-18 (Bankr. D. Mass. 1987) (holding that lessor was entitled to an administrative expense claim "at the per diem rental rate established in the lease" for trustee's continued post-rejection occupancy of lessor's premises); *In re PYXSYS Corp.*, 288 B.R. 309, 318 (Bankr. D. Mass. 2003) (holding that when calculating a lessor's administrative "use claim" for debtor's continued post-rejection occupancy of lessor's premises, "the terms of the lease should be used to value the benefit conferred by the use of the premises in the absence of evidence that said terms were unreasonable.").

Because HIG failed to introduce sufficient evidence suggesting that the royalty rate provided in the License Agreement was not reflective of the fair market value of the BHG Marks, the terms of the License Agreement provide guidance regarding the value of HIG's continued use of those marks. As **is** relevant here, upon termination of the license to use the BHG Marks, the License Agreement provides for a two-year contractual "Sell-Off Period." *See* Meredith Ex. 1, (License Agreement, at I.(7), and Second Amendment to License Agreement ("Second Amendment"), at 5). During the first year following termination of the License Agreement, the parties agreed that Meredith would be entitled to receive the GAMR. *See* Meredith Ex. 1, (Second Amendment, at 5(b)). During the second year following termination of the License Agreement, the parties agreed that Meredith would be entitled to receive one-half of the GAMR. *Id.* In other words, the parties

recognized that notwithstanding the termination of the License Agreement, HIG would have product, and shipping containers to distribute that product, bearing the BHG Marks that HIG would continue to sell and use in its business operations. And, because of that fact, the parties negotiated the price that HIG should pay for its ability to continue to use the BMG Marks following a termination of the License Agreement.

While rejection of the License Agreement constitutes a breach of that agreement, not a termination of it, 11 U.S.C. §365(g); *see also In re Continental Airlines*, 981 F.2d 1450, 1459-61 (5th Cir. 1994), those contractual provisions are instructive as to what the parties thought would be reasonable compensation for HIG's continued use of the BHG Marks during a wind-down period. Following its rejection of the License Agreement, HIG has continued to use and benefit from the circulation of promotional materials in the marketplace that contain products bearing the BHG Marks. Moreover, HIG has continued to sell and distribute such products following its rejection of the License Agreement. While there is nothing scientific about Meredith's use of September 29, 2008 (the date of distribution of the Winter Quarterly catalog) as the outside date for its continuing administrative expense claim, that date is a logical one and, significantly, it provides for a substantially shorter "Sell-Off Period" than that contemplated by the parties under the License Agreement. Summer products (like those displayed in the Summer Quarterly catalog) are not likely to be of much interest to consumers during the winter months and the parties agree that the Winter Quarterly does not include any products bearing the BHG Marks. Moreover, Meredith's use of one-half of the prorated amount of the GAMR due to it under the License Agreement for the Second Period is not only reasonable, it is generous given the terms of the License Agreement that would otherwise suggest that full payment for such period is appropriate. Similar reductions, based upon

decreased but still existent value to the debtor's bankruptcy estate in the post-rejection period, have been adopted by other courts. *See, e.g., In re Homeowner's Outlet Mall Exch.*, 89 B.R. at 970-71 (the court looked to contract rental rate for guidance, and then reduced the post-rejection per diem rate to reflect the fact that the debtor occupied only a portion of the leased premises during the post-rejection period); *In re Cardinal Indus.*, 109 B.R. at 741 (court found that debtor continued to occupy approximately one-third of the leased space post-rejection and, due to the reduced value to the debtor of this partial occupation, fashioned an administrative claim allowance based upon one-half of the contract rate).

While the Court agrees that Meredith is entitled to an administrative expense claim for the Second Period, the Court does not agree with Meredith's calculation of the claim amount. Rather, the Court calculates Meredith's administrative expense claim for the Second Period as follows. Within the Second Period, 48 of the days occurred during the May 1 - July 31 quarterly interval. As was previously discussed, the applicable per diem for this period is $12,228.26 for a total amount of $586,956.48, one half of which is $293,478.24. The remaining 60 days of the Second Period fall within the August 1 - October 31 quarterly interval. The GAMR payment due for this period totals $900,000, which equates to $9,782.61 per day. Multiplying this per diem amount by the number of applicable days, 60, provides an amount totaling $586,956.60, one half of which equals $293,478.30. Adding these two amounts together gives Meredith an administrative expense claim of $586,956.54 for the Second Period.

However, since the Application only sought allowance of an administrative expense claim of $568,681.44 for the Second Period, the Court will allow the claim in the amount sought by Meredith.

## IV.    CONCLUSION

HIG continued to market, sell, and distribute products bearing the BHG Marks post-petition during both the First Period and the Second Period.  This continued post-petition use of the BHG Marks arose as a result of actions taken by HIG that benefitted the HIG bankruptcy estate. Accordingly, Meredith is entitled to an allowed administrative expense claim to compensate it for such post-petition use of the BHG Marks.

The Application is granted and the Claim Objection is overruled.  Meredith is allowed an administrative expense claim in the Case of $1,125,000.24

**SO ORDERED.**

**### End of Memorandum Opinion and Order ###**